# EXHIBIT A

VAN KAMPEN

704.247.3245

315 E WORTHINGTON AVENUE
CHARLOTTE, NC 28203

July 20, 2026

**Via In UPS**
DT Soccer LLC
d/b/a Charlotte FC – Tepper Sports and Entrainment
800 South Mint Street
Charlotte, NC 28202

**Re: Dusitn Swinehart v. DT Soccer LLC d/b/a Charlotte FC – Tepper Sports and Entrainment, Case No. 26CV036044-590**

To Whom it May Concern:

Please find enclosed a copy of the file stamped Application and Order Extending Time to File Compliant with its Civil Summons and the Compliant with its Civil Summons for the above reference case.

Should you have any questions or concerns, please feel free to reach out to our office. Thank you for your time and assistance on this matter.

Sincerely yours,

Carmen Zamora, Senior Litigation Paralegal

**STATE OF NORTH CAROLINA**

Mecklenburg County

File No. 26CV036044-590

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Dustin Swinehart | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| *Address*<br>3301 Mill Race Road | |
| *City, State, Zip*<br>Charlotte NC 28270 | G.S. 1A-1, Rules 3 and 4 |
| **VERSUS** | |
| *Name Of Defendant(s)*<br>DT Soccer, LLC d/b/a Charlotte FC - Tepper Sports and Entrainment | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| DT Soccer, LLC, d/b/a Charlotte FC - Tepper Sports and Entrainment<br>800 South Mint Street<br>Charlotte NC 28202 | |

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and
2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | *Date Issued* | *Time* |
|---|---|---|
| Joshua Van Kampen<br>Van Kampen Law, PC.<br>315 E. Worthington Ave<br>Charlotte NC 28203 | 7/16/2026 | 4:30:29 pm ☐ AM ☐ PM |
| | *Signature* /s/ Harvey Frison | |
| | ☒ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk Of Superior Court* | |

| | *Date Of Endorsement* | *Time* |
|---|---|---|
| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | | ☐ AM ☐ PM |
| | *Signature* | |
| | ☐ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk Of Superior Court* | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)


© 2016 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| *Date Served* | *Time Served* ☐ AM ☐ PM | *Name Of Defendant* |
|---|---|---|
| | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| *Date Served* | *Time Served* ☐ AM ☐ PM | *Name Of Defendant* |
|---|---|---|
| | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| | |
|---|---|
| *Service Fee Paid*<br>$ | *Signature Of Deputy Sheriff Making Return* |
| *Date Received* | *Name Of Sheriff (type or print)* |
| *Date Of Return* | *County Of Sheriff* |


© 2016 Administrative Office of the Courts

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO.: 26CV036044-590

DUSTIN SWINEHART,

Plaintiff,

v.

DT SOCCER, LLC, d/b/a CHARLOTTE FC – TEPPER SPORTS AND ENTERTAINMENT,

Defendant.

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Since its inception, Plaintiff Dustin Swinehart ("Dustin" or "Plaintiff") served DT Soccer, LLC d/b/a Charlotte FC ("Charlotte FC" or "CFC") as Director of Community Engagement. Charlotte FC's then-President, Tom Glick, specifically recruited Dustin to be Charlotte FC's first hire, and for good reason. Dustin was arguably one of Charlotte's most distinguished professional soccer players: a college All-American scholar athlete; a twelve (12) year professional playing career with the United Soccer League's ("USL") Charlotte Eagles; one of the USL's all-time leading scorers; a USL Hall of Fame inductee in 2012; and a widely recognized philanthropist through his local charity, Project 658.

2. Tepper Sports and Entertainment (which holds itself out publicly as Charlotte FC, the Carolina Panthers, and Bank of America Stadium) (collectively "TSE") is unique in professional sports in that it is led primarily by a powerful female triumvirate of Nicole Tepper,

TSE CEO Kristi Coleman, and TSE Chief Human Resource Officer ("CHRO") Kisha Smith. Dustin learned the hard way that TSE applies two sets of rules: a quick trigger for terminating men and a lenient approach for women.

3. Dustin was summarily terminated despite being the longest tenured CFC employee for an act of kindness that angered Ms. Smith. On August 7, 2024, a set of twin boys walked away from a camp hosted by Charlotte FC. Though the boys were located and retrieved without incident, a high-level meeting was held to discuss it. During the meeting, Ms. Smith stepped out of her lane regarding personnel and interjected that the family should not be contacted in writing, a position that was not echoed or endorsed by CFC's in-house counsel. Dustin also wanted to offer the family a match-day suite and obtained his boss's approval shortly after the meeting. He assigned his Community Engagement Coordinator to extend the invitation, which he did via email. The father graciously accepted and replied, "This is incredibly kind and totally unnecessary."

4. Thereafter, Ms. Smith called Dustin. She was livid and berated him for defying her input that the family not be contacted in writing. Although his boss approved the suite and the father's response insulated CFC from liability, Dustin was terminated the next day for alleged "insubordination" toward Ms. Smith. He was replaced by a woman with no MLS or other professional soccer experience.

5. The abrupt and unceremonious end to Dustin's career stands in stark contrast to how Nicole Tepper, Kristi Coleman, and Ms. Smith handled issues involving women in the organization. TSE fostered a culture that prioritized both rapid advancement and a more lenient standard for women. For example, TSE overlooked: (i) unprofessionalism, policy violations, dishonesty, and gross misconduct by Ms. Smith; (ii) excessive drinking, poor judgment and gross negligence by the Director of the David and Nicole Tepper Foundation (the "Foundation") that

created potential liability issues with the University of South Carolina "Tepper Scholars"; and (iii) racist comments by another female TSE manager.

6. While Plaintiff and this Firm support the goal of gender diversity in the workplace and oppose the targeting of companies merely for having DE&I programs, Defendant fostered an uneven gender landscape that punished men and protected women, and in so doing violated federal and North Carolina law. Accordingly, Plaintiff asks this Court to order Defendant to make Dustin whole for his harms and losses for Wrongful Discharge in Violation of North Carolina Public Policy (Count I) and sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count II).

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff is a resident of Mecklenburg County, North Carolina.

8. DT Soccer, LLC d/b/a Charlotte FC and as Tepper Sports and Entertainment, is a Delaware Limited Liability Company with a principal place of business at 800 S. Mint Street in Charlotte (Mecklenburg County), North Carolina.

9. Plaintiff was employed by Defendant and worked at the Charlotte FC headquarters located at 8600 McAlpine Park Drive, Charlotte, N.C. 28211.

10. Plaintiff seeks damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243 *et seq.*

11. Venue is proper in this Court pursuant to N.C. Gen. Stat. § 1-82.

## FACTS

### A. Dustin's Professional Sports Background and Philanthropy

12. Soccer has always been a cornerstone in Dustin's life. After emerging from his collegiate career as a decorated Scholar All-American, Dustin went on to become a professional soccer player in the USL from 1996 to 2009, including twelve years (1998 to 2009) with the Charlotte Eagles. Dustin was named First Team All-League six times during his career and was part of two USL National Championship teams with the Eagles. In 2012, Dustin's career was memorialized when he was inducted into the USL Hall of Fame as one of the league's all-time leading scorers. (Ex. A).

13. In 2009, Dustin and Betty (his wife of twenty-four years) founded Project 658, which provides sustainable, holistic care to refugees resettling in the Charlotte area. (Ex. B). It is a continuation of work he did as a professional athlete and for a non-profit called the Sports Outreach Institute between approximately 2008 to 2011. In that role, Dustin volunteered in some of the most vulnerable and dangerous places in Africa and Central America. (Ex. C) Betty and Dustin had a vision to help these same populations once they received refugee status in this country. Project 658 was founded with a plan to provide services for families and to be a largely self-sustaining program by generating approximately 50% of its revenue from social business programs, including a culinary training program that provides catering to local businesses and an event space for rent. Additionally, they partnered with Novant to launch a medical and counseling clinic to provide services to Project 658's families. Presently, Project 658 employs 50 staff members, has over 100 volunteers, and provides over $4M in wrap-around services to over 5,000 at-risk refugee community members each year.

14. Not surprisingly, soccer is an important part of Betty and Dustin's children's lives. Their three sons played college soccer, and their daughter is a high school soccer player and competitive cheerleader.

**B. Dustin's Employment with Charlotte FC**

15. On January 2, 2020, Charlotte FC hired Dustin as the Director of Community Engagement. Building a football club from the ground up is a daunting task, but Dustin's background was well-suited for the bold endeavor, and he was integrally involved with building one of the most engaged clubs in MLS.

16. Dustin's team at Charlotte FC developed many community programs, including Greater Goals (an afterschool program for soccer and literacy across Charlotte and Winston-Salem that impacts over 750 kids annually); Unified (a Special Olympics-related program that has now spread to over five cities); Pitches for Progress (a neighborhood-based soccer mentoring program that installs soccer fields and mobilizes a coach in the neighborhood); and multiple other Charlotte FC Charities. Dustin also worked on Charlotte FC's support of and outreach to members of the military. (Ex. D).

17. Dustin's success did not stop with these programs. As a senior leader, Dustin was instrumental in identifying and securing the location of Charlotte FC's headquarters and training facility and in launching the Academy Homestay Program, which supports the development of Academy players. The Charlotte FC Community team was a finalist for the MLS community team of the year in 2023.

18. Dustin received positive feedback regarding his performance. He received positive evaluations. He was never disciplined or placed on a performance improvement plan.

19. Every indication pointed to a lengthy career and advancement with Charlotte FC.

C. **An Isolated Incident at a CFC Soccer Camp Ends Well**

20. Since approximately 2020, Charlotte FC has operated at least 200 Youth Soccer Camps and Clinics, trained thousands of kids, and had done so without serious incident. However, during a multi-day camp on August 7, 2024, twin boys who were full-day participants at the camp left the facility with the half-day participants. Jake Wolkerstorfer, Community Engagement Coordinator, and their Coach, Ryan Hays, were on-site but did not notice the boys leaving. Fortunately, a friend of Dustin's noticed the boys walking down the street alone, called him, and gave him their location. Dustin immediately informed Mr. Wolkerstorfer. By that point, a Good Samaritan had already seen the boys and called the police, who promptly responded. When the father arrived, he was not angry with the camp staff or Charlotte FC; he was primarily apologetic for his sons walking off. By that point, the boys had participated in camp programs for three full days; it is unclear what led them to leave the camp at the half-day mark unaccompanied.

21. Although there was a positive outcome and no harm came to the boys, Dustin and Charlotte FC senior leadership saw this as an opportunity to improve measures for future camps. On Thursday, August 8, 2024, there was a high-level Zoom meeting regarding the incident attended by: Dustin, Head of Security Eddie Levins, Head of Communications Tamara Green, CHRO Kisha Smith, Vice President of Partnerships Natalee Jarrett, Charlotte FC President Joe LaBue, TSE in-house counsel David Bott, Deputy General Counsel of Charlotte FC David Vaught, Carolina Panthers President Kristi Coleman, and Jake Wolkerstorfer. During the call, Mr. LaBue accepted ultimate responsibility by stating, "This is on me." CFC decided to add an additional check-in after the lunch break as an additional layer of security, and that the remaining few days of the camp would be canceled, given the expected inclement weather. The family's reaction was discussed, and Mr. LaBue directed that a refund be issued. At this point, Ms. Smith added that

there should be no further written communication with the family. This suggestion did not come from the legal department or the communications representatives and was outside Ms. Smith's area of responsibility. In fact, there was no discussion about potential legal liability from in-house counsel; Ms. Smith's comment was an outlier. Nor was there any suggestion that Dustin or his team were culpable in any way for the actions of the twins.

22. On Monday, August 12, 2024, Dustin and Mr. Levins conducted a deep dive into the incident, focusing on changes to implement during future camps.

23. That same day, Dustin met with his boss, Ms. Jarrett. During this meeting, which covered various other issues, Dustin shared an idea to invite the family to watch a CFC match in one of the suites that are specifically allotted to his Community Engagement team. Ms. Jarrett agreed.

24. After his meeting with Ms. Jarrett, Dustin asked Mr. Wolkerstorfer to confirm if they had received the refund and determine if they wanted to accept the suit tickets. Dustin did not tell Mr. Wolkerstorfer how to communicate with the family.

25. On August 12, 2024, at 4:39 pm, Mr. Wolkerstorfer emailed the father stating: "I've processed your refund and if it's of interest to you, we would love to host you and your family in a suite at one of our upcoming matches." (Ex. E).

26. On August 13, 2024, at 10:20 am, the father responded and stated, "This is incredibly kind and totally unnecessary, but I am not one to pass up an opportunity to be in the suite. I'd love to hear more details." *Id.*

**D. Dustin is Terminated for "Insubordination" to CHRO Kisha Smith and Replaced by a Less Qualified Female**

27. On August 13, 2024, Ms. Smith and Human Resources Business Partner Adeleen Martinez called Dustin and, without so much as a hello, Ms. Smith aggressively interrogated him

about why an email had gone out to the family. She badgered Dustin, asking whether he recalled her saying not to contact the family in writing. Dustin informed Ms. Smith that the family had to be notified of the refund, which had been agreed upon in her presence, and that Ms. Jarrett had approved the invitation to the suite.

28. This same day, Jake Wolkerstorfer informed Dustin that Ms. Smith had confiscated his computer and personal cell phone. There was no apparent business reason to require an employee to surrender a personal device, but this was typical of the lack of professional and personal boundaries with which Ms. Smith conducted herself.

29. On August 14, 2024, Dustin was called into a meeting with Mr. LaBue and Ms. Martinez (Ms. Smith's direct report), where he was terminated. Blindsided, Dustin asked why. Mr. LaBue responded that it was because of the email to the family. Mr. LaBue's demeanor and lack of verve in articulating the rationale in the meeting suggested his hand was forced. Ms. Martinez clarified that he was being fired for "insubordination" because he heard Ms. Smith's statement about employees having no written communication with the family. Dustin was escorted out of the building as if he were a threat, and with no opportunity to say goodbye to colleagues. Ms. Martinez was visibly upset, suggesting she too did not agree with the decision.

30. Dustin was terminated for a harmless act of kindness. As CHRO, Ms. Smith was acting outside her job responsibilities when she injected her opinion that the family should not be contacted in writing. Her suggestion was not a legal opinion. In fact, TSE had two attorneys in the meeting who did not express concern about the family suing, nor did they echo or validate Ms. Smith's concern about written communication. The only litigation risk from the incident was in Ms. Smith's imagination. Additionally, there was no harm from Mr. Wolkerstorfer's email. In fact, the father's response that the gesture was "incredibly kind and totally unnecessary" effectively

inoculated Charlotte FC from any future liability. Moreover, Ms. Jarrett, Vice President of Partnerships, and Dustin's direct supervisor, approved the suite offer. Further, Dustin did not send the email; he only asked Mr. Wolkerstorfer to "confirm" with the family. Mr. Wolkerstorfer decided to email the father rather than call. Regardless, it is nonsensical that a verbal communication of the offer would have been permissible, but an email communication was terminable.

31. Moreover, Dustin's impeccable employment record, long tenure, and immense contributions all militated in favor of a more measured response, even assuming Dustin erred in failing to ensure Mr. Wolkerstorfer notified the family via phone.

32. Based on the known evidence, Ms. Smith was the impetus for the termination. She was the only executive known to be angered by the email. She aggressively interrogated Dustin and took the extraordinary step of confiscating Mr. Wolkenstorfer's personal phone, even though the email sent to the family was from his work email. Further, Ms. Martinez admitted in the termination meeting that Dustin was fired for insubordination toward Ms. Smith. Indeed, it does not even appear that his boss, Ms. Jarrett, was consulted about the termination decision, as Dustin had a routine check-in meeting with her roughly 20 minutes before the termination meeting, and Ms. Jarrett gave him no indication that he was about to be fired.

33. Ms. Smith had the stature and authority to force his termination, especially given her close relationship with Ms. Tepper and Ms. Coleman. Ms. Smith could seemingly save a job or take a job with little recourse for the affected employee, a recipe for biases to infect her decision-making.

34. Although Mr. LaBue technically communicated Dustin's termination, he was out of a job around four months later, belying that he had the ability to overrule Ms. Smith. Indeed,

Mr. LaBue and Dustin had a positive employment working relationship. And historically, Mr. LaBue had been in Dustin's corner. He did not have a stake in Ms. Smith's instruction being followed, whilst Ms. Smith was literally angered by the situation.

35. With Mr. LaBue's termination, Kristi Coleman became the CEO of TSE, overseeing all business operations for Charlotte FC, the Carolina Panthers, and Bank of America Stadium.

36. CFC replaced Dustin with Tiara Brown despite her having zero MLS or other professional soccer experience.

**E. Dustin Was Fired by an Organization That Prioritized Promoting and Retaining Women and Applied a Different Standard to Men.**

37. While striving for diversity is a worthy organizational goal, especially in an industry where women have historically been underrepresented, CFC and TSE crossed legal lines by maintaining disparate standards for women and men in hiring, promotions, and terminations.

38. The directive to afford women preferential treatment came from the top. Ms. Tepper openly commented about wanting the Panthers to be "first" in diversity hires. For example, she pushed for the Panthers to be the first to hire a female team president. Ms. Tepper came close; with Kristi Coleman's promotion to President of the Carolina Panthers in 2022, the Panthers became the *second* NFL team with a female president. When TSE fired Mr. LaBue as President of CFC, it cleared a path for Ms. Coleman's promotion to CEO of TSE, overseeing business operations for the Panthers, CFC, and Bank of American Stadium. That promotion capped a meteoric rise from her hiring as controller in 2010 and made Ms. Coleman arguably one of the most powerful female professional sports executives in America. Ms. Tepper also openly pushed for the hiring of the first female NFL play-by-play announcer, though she was ultimately unsuccessful in making that hire.

39. As CHRO, Ms. Smith was closely aligned with Ms. Tepper's push to make TSE a trailblazer for women in sports. Nicole Tepper, Ms. Coleman, and Ms. Smith brought in Ross Initiative in Sports and Equality (RISE) to provide DEI training.

### F. Dustin Was Fired for Kindness, While Several Women faced no repercussions for Egregious Conduct

#### 1. Keisha Smith

40. Ms. Smith was afforded a more lenient standard of conduct than Plaintiff. Ms. Smith was condescending, derisive, and rude to many colleagues, and in other organizations, that would have been grounds for discipline, especially for a CHRO – a position that is supposed to be the gold standard for promoting civility, culture, and professionalism. Nonetheless, her close relationship with Ms. Tepper and Ms. Coleman permitted Ms. Smith to act as an untouchable.

41. Ms. Smith wielded her CHRO role more like a cudgel than as a counselor. While CHROs typically advise managers on risks and processes related to personnel actions while leaving the decision to them, Ms. Smith openly advocated for specific outcomes, such as termination, effectively supplanting the manager as the decisionmaker. She escalated situations to achieve the outcomes she wanted, rather than taking a more collaborative, measured decision-making approach. The asymmetric power dynamic allowed Ms. Smith to effectuate Dustin's termination, while his supervisor, Ms. Jarrett, was seemingly not even consulted, and Mr. LaBue, CFC's President (albeit only for a handful of additional months), was merely the messenger tapped to deliver the bad news.

42. Further, Ms. Smith engaged in gross misconduct by pressuring personnel to lie to the media in the summer of 2023. On June 19, 2023, there was a report by CBS Sports entitled "Panthers have been in violation of NFL rules regarding search for permanent head coach." That article accurately reported that Nicole Tepper had not completed the NFL's mandatory inclusive

hiring training before participating in interviews for the Panthers' head coaching search. Ms. Smith pressured internal staff to submit a dishonest public comment, claiming that the Panthers were in compliance because Ms. Smith had purportedly trained Ms. Tepper before she participated in the hiring process. Upon information and belief, Ms. Smith was not among the eight trainers approved by the NFL, and thus was not qualified or authorized to train Ms. Tepper. Indeed, it is dubious that the NFL would have approved a team HR executive self-training within an organization due to conflict-of-interest considerations. Upon information and belief, one or more Panthers staff members refused to repeat Ms. Smith's inaccurate statement publicly in response to the story. Ultimately, the article did not attribute a name to the Panthers' official public response that had erroneously claimed Ms. Tepper "was trained prior to participating in interviews."

43. Ms. Smith engaged in misconduct in at least two ways in this incident. First, as CHRO, it would have been her job to ensure that the NFL's requirements were followed in the head coach interview process. Ms. Tepper received special treatment by being exempted from the mandatory training. Ms. Smith's failure to ensure NFL requirements were met caused significant public embarrassment. Second, Ms. Smith magnified her initial misconduct by pressuring staff to repeat the false statement in a shoddy attempt to cover up the initial failure. Permitting a CHRO to pressure personnel to engage in a cover-up is a betrayal of the role's core duties and sets a dangerous precedent by signaling that it is permissible to engage in misconduct and to flaunt policy and legal requirements.

**2. Jane Doe 1**

44. Jane Doe 1 (female) is the Director of the Dave and Nicole Tepper Foundation. It is unknown whether she is paid by the Foundation or TSE, but her responsibilities as a community relations, public relations, and special events professional were closely integrated and intertwined

with TSE. She was an active member of the Community Relations teams for the Panthers and Charlotte FC. She regularly attended Community Relations Meetings and directly participated in community relations decision-making, along with Plaintiff and other TSE employees. Similarly, she was actively involved in philanthropic activations involving CFC and the Panthers. She was a frequent attendee in game-day suites for Panthers and CFC games, as well as all community-facing events. Jane Doe 1's office was in Bank of America Stadium, as were those of other TSE executives at the time. The Foundation is not believed to have its own policies or procedures. Indeed, when complaints were made about Jane Doe I, they were directed to TSE executives and investigated by Ms. Smith. TSE executives were consulted regarding Jane Doe 1's hiring. Jane Doe 1 was also involved with interviewing Plaintiff's replacement.

45. Upon information and belief, Nicole Tepper hired Jane Doe 1 despite concerns expressed by one or more TSE executives about Ms. Doe 1's alcohol consumption and that her public behavior would reflect poorly on TSE. Ms. Doe 1's conduct at the Foundation was punctuated by multiple instances of rank public intoxication, which reflected badly on TSE. For example, her behavior at a golf charity event at Kiawah Island Golf Resort in June 2022, attended by Dustin and other senior leaders, is indicative of her misconduct. There, Ms. Doe 1 became so drunk that she caused a scene, got into a verbal altercation with another guest, and needed to be escorted to her room. Although the incident was immediately reported to Kristi Coleman and Steven Drummond, no corrective action was taken.

46. Accordingly, it was shocking when Ms. Doe 1 was entrusted with the responsibility for the first cohort of University of South Carolina ("USC") Tepper Scholars at Super Bowl LVII in Glendale, Arizona, in February 2023. The Tepper Scholars' attendance at the Super Bowl was part of their internship and designed to provide them with work experience. By way of background,

in 2020, the Foundation launched the Tepper Scholars Program with the USC Department of Sports and Entertainment Management. Initially funded at $1.5 Million, the Teppers would ultimately commit another $5 Million gift, culminating in USC renaming the department the "David and Nicole Tepper Department of Sports and Entertainment Management." The first cohort consisted of four USC freshmen. The Tepper Scholar program was squarely within Ms. Doe 1's responsibilities.

47. Ms. Doe 1 was the designated responsible party for the Tepper Scholars for Super Bowl weekend, with another TSE employee tasked (as a side job) with driving them in a rented minivan during their stay. Ms. Doe was derelict in her duties in multiple ways. First, Ms. Doe did not plan work experiences, events, or any activities in advance. She told the driver to simply "go with the flow," leaving the driver (who had no official interactions or responsibilities with the Tepper Scholars before this assignment) scrambling to fill their days. Second, Ms. Doe 1 became grossly intoxicated at two dinners. She was so drunk that her speech became incoherent. She was loud and an embarrassment to those around her and was so inebriated that she could not fulfill her responsibility to supervise the Tepper Scholars. Her level of intoxication at the Super Bowl itself was even worse. At the end of the Super Bowl, Ms. Doe 1 was so drunk she could not coordinate with the driver to get the Tepper Scholars to the pre-arranged pick-up location. The pick-up occurred only because the driver coordinated directly with the Tepper Scholars. Once Ms. Doe 1 ambled into the car, she blamed the driver for the debacle and mused that she could not wait to tell Nicole Tepper about the incident, a veiled threat to the driver's job. Several of the Tepper Scholars were so disconcerted with Ms. Doe 1's rank intoxication that they confided in the driver about their concerns. For example, an African American scholar reported to the driver that s/he was offended by Ms. Doe 1's comment that Rihanna's halftime performance at the Super Bowl was

"so ghetto." Another scholar disclosed she considered quitting the program because of Ms. Doe 1's misconduct.

48. To his/her credit, the driver escalated the incident and the Tepper Scholar's concerns to Vice President of Compliance and Operations Eddie Levins. He directed the driver to report these various incidents to Keisha Smith. The following week, the driver met with Ms. Smith in her office and reported these events in a meeting lasting approximately forty-five minutes. Ms. Smith never followed up with the driver about the results or status of her investigation. Neither Jane Doe 1 nor TSE ever apologized to the driver, and Ms. Doe 1 faced no apparent repercussions. When the driver communicated his/her disappointment with Ms. Smith's lack of response to the report, Ms. Smith responded sarcastically, saying, "What would have made [driver's name] happy?"

49. Ms. Smith was similarly gruff and unprofessional, responding to the driver's request for assistance with concerns about pay equity and TSE's posture toward mental health in the workplace.

50. Ultimately, TSE terminated the driver within a week of her return from medical leave in March 2024, a possible violation of federal law. Meanwhile, Jane Doe 1 remains the Director of the Foundation.

**3. Jane Doe 2**

51. Upon information and belief, Jane Doe 2, TSE Digital Partnership Manager, publicly used racial slurs on at least two occasions. Specifically, during a dinner with the digital team of former Senior Director of Content and Broadcasting Bill Voth, she commented on eating "Dirty Mexican Food." In another instance, she made a "monkey" joke about an African American player to Mr. Voth's digital team. These incidents, which were inappropriate and offensive and

violated TSE/Panthers' workplace policies, were officially reported up the chain of command and escalated to Keisha Smith.

52. Upon information and belief, Jane Doe 2 was only given a warning for her racially inappropriate comments. Subsequently, upon information and belief, she was promoted from TSE Digital Partnership Manager to the Director of Integrated Marketing for Charlotte FC.

53. In short, Dustin was summarily terminated for an act of kindness, while no fewer than three female TSE employees – including the apparent decision-maker in his termination – were retained – even promoted – despite serious misconduct.

## LEGAL CLAIMS

## COUNT ONE

***(Wrongful Discharge in Violation of North Carolina Public Policy)***

54. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

55. The public policy of the State of North Carolina, as set forth in the Equal Employment Practices Act, N.C. Gen. Stat. § 143-422 *et seq.*, prohibits employers with more than fifteen (15) employees from discriminating against employees on the basis of their sex.

56. Defendant has more than fifteen (15) employees.

57. Defendant violated this public policy by terminating Plaintiff because he is male.

58. As a proximate result of Defendant's conduct, Plaintiff has suffered damages including, but not limited to: lost wages and benefits, damage to reputation, diminished earning capacity, emotional distress, humiliation, anxiety, medical expenses, consequential damages, and other compensatory damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court divisions pursuant to N.C. Gen. Stat. § 7A-243.

59. Defendant's actions were done maliciously, willfully, wantonly, and/or in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant's officers, managers, and directors participated in, ratified, and/or condoned the conduct described above. As a result, Plaintiff is entitled to recover punitive damages from Defendant pursuant to N.C. Gen. Stat. § 1D-15 in an amount sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

## COUNT TWO

***(Violations of Title VII of the Civil Rights Act of 1964)***

54. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

55. Defendant employed more than fifteen (15) employees during the relevant period.

56. Plaintiff timely filed a charge of discrimination with the EEOC on January 26, 2025, received a Notice of Right to Sue on March 31, 2026, and initiated legal action within ninety (90) days thereafter.

57. Defendant violated Title VII by terminating Plaintiff because of his sex.

58. Defendant operated a corporate culture that prioritized and favored hiring and retaining women. While men like Plaintiff were terminated on the thinnest of grounds, Defendant showed shocking leniency in overlooking far more egregious conduct by women in the organization. Title VII does not permit employers to have two sets of standards based on gender, but that was the result of a slanted culture cultivated by Nicole Tepper, Kristi Coleman, and Ms. Smith.

59. The evidence shows that had Plaintiff been female, he would not have been terminated. After all, he was the longest-tenured CFC employee and had amassed an exemplary

employment record without a blemish. The incident for which he was terminated caused no harm to Defendant. Rather, his sole offense was to irk Defendant's powerful CHRO because his direct report confirmed the family's receipt of the refund and their interest in attending a match in a suite via email instead of a phone call. Despite more measured options being available such as a written warning, Defendant and its CHRO summarily terminated Plaintiff. Consistent with the stated mission of hiring more women, Defendant replaced him with a less qualified female external candidate.

59. As a proximate result of Defendant's conduct, Plaintiff has suffered lost income, diminished earning capacity, future lost wages and benefits, emotional distress, anxiety, humiliation, expenses, reputational harm and consequential damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

60. Defendant's actions were done maliciously, willfully, wantonly, and/or in a manner that demonstrates a reckless disregard for Plaintiff's rights such that Plaintiff is entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court:

A. Enter a judgment against Defendant to pay Plaintiff economic and non-economic compensatory damages;

B. Award Plaintiff punitive damages;

C. Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action, including prejudgment interest; and

D. Award Plaintiff such other and further equitable relief as the Court deems

appropriate under the circumstances, including front pay.

**JURY TRIAL DEMANDED**

Plaintiff hereby respectfully demands a trial by jury of the allegations contained in this Complaint.

This the 16th day of July 2026.

Joshua R. Van Kampen (NC Bar No. 32168)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Email: josh@vankampenlaw.com
*Attorney for Plaintiff*



EXHIBIT
A




**EXHIBIT**
**A**




EXHIBIT
A




EXHIBIT
B




EXHIBIT
B




EXHIBIT
B



**EXHIBIT**
**C**




**EXHIBIT**
**D**



EXHIBIT
D

Re: Full Refund and Suite

[redacted]

Tue 8/13/2024 10:20 AM

To:Wolkerstorfer, Jake <Jake.Wolkerstorfer@charlottefootballclub.com>

Hey Jake,

That is INCREDIBLY kind! Totally unnecessary, but I am not one to pass up an opportunity to be in the suite. I'd love to hear some more details.

Thank you again!

[redacted]

On Mon, Aug 12, 2024 at 4:38 PM Wolkerstorfer, Jake <Jake.Wolkerstorfer@charlottefootballclub.com> wrote:

Hi [redacted] I hope all is well today!

Quick update: I've sent over a full refund for [redacted]

Additionally, if it's of interest to you, we would love to host your family in a suite at one of our upcoming matches.

Just let me know if you'd be interested in this and we can coordinate all the details.

Thanks so much,


***Jake Wolkerstorfer***
***Community Engagement Coordinator***

**Charlotte Football Club**
Atrium Health Performance Park
8600 McAlpine Park Dr
Charlotte, NC 28211
Jake.Wolkerstorfer@charlottefootballclub.com
CharlotteFootballClub.com | Instagram | Twitter


EXTERNAL EMAIL: This message has originated from outside your organization. Please take care when clicking links or opening attachments. If unsure, please contact the Helpdesk.

EXHIBIT
E

# STATE OF NORTH CAROLINA

Mecklenburg County

File No 26CV036044-590

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name And Address Of Plaintiff 1
Dustin Swinehart

3301 Mill Race Road
Charlotte NC 28270

Name And Address Of Plaintiff 2

## GENERAL CIVIL ACTION COVER SHEET

☒ INITIAL FILING ☐ SUBSEQUENT FILING

Rule 5(b) of the General Rules of Practice for the Superior and District Courts

**VERSUS**

Name And Address Of Defendant 1
DT Soccer, LLC,
d/b/a Charlotte FC - Tepper Sports and Entertainment
800 South Mint Street
Charlotte NC 28202

Summons Submitted ☒ Yes ☐ No

Name And Address Of Defendant 2

Summons Submitted ☐ Yes ☐ No

Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)
Joshua R. Van Kampen
Van Kampen Law, PC
315 E. Worthington Ave
Charlotte NC 28203

Telephone No. 704-247-3245

Cellular Telephone No

NC Attorney Bar No 32168

Attorney Email Address josh@vankampenlaw.com

☒ Initial Appearance in Case ☐ Change of Address

Name Of Firm Van Kampen Law, PC

Fax No

Counsel For
☒ All Plaintiffs ☐ All Defendants ☐ Only: *(list party(ies) represented)*

☐ Jury Demanded In Pleading ☐ Complex Litigation ☐ Stipulate to Arbitration

## TYPE OF PLEADING

*(check all that apply)*

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) *(see Note)*
☐ Change Venue (CHVN)
☐ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) *Assess Court Costs*
☐ Crossclaim *(list on back)* (CRSS) *Assess Court Costs*
☐ Dismiss (DISM) *Assess Court Costs*
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☒ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)
☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint *(list Third Party Defendants on back)* (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other *(specify and list each separately)*

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

## CLAIMS FOR RELIEF

- [ ] Administrative Appeal (ADMA)
- [ ] Appointment Of Receiver (APRC)
- [ ] Attachment/Garnishment (ATTC)
- [ ] Claim And Delivery (CLMD)
- [ ] Collection On Account (ACCT)
- [ ] Condemnation (CNDM)
- [ ] Contract (CNTR)
- [ ] Discovery Scheduling Order (DSCH)
- [ ] Injunction (INJU)
- [ ] Limited Driving Privilege - Out-Of-State Convictions (PLDP)
- [ ] Medical Malpractice (MDML)
- [ ] Minor Settlement (MSTL)
- [ ] Money Owed (MNYO)
- [ ] Negligence - Motor Vehicle (MVNG)
- [ ] Negligence - Other (NEGO)
- [ ] Motor Vehicle Lien G.S. Chapter 44A (MVLN)
- [ ] Possession Of Personal Property (POPP)
- [ ] Product Liability (PROD)
- [ ] Real Property (RLPR)
- [ ] Specific Performance (SPPR)
- [x] Other *(specify and list each separately)*

(1) Wrongful Discharge in Violation of North Carolina Public Policy and (2) Title VII of the Civil Rights Act of 1964.

| Date | Signature Of Attorney/Party |
|---|---|
| 6/26/26 | [signature] |

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ Additional Plaintiff(s) |
|---|---|
| | |
| | |
| | |
| | |
| | |

| No. | ☐ Additional Defendant(s) ☐ Third Party Defendant(s) | Summons Submitted |
|---|---|---|
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*


© 2019 Administrative Office of the Courts

**STATE OF NORTH CAROLINA**

Mecklenburg County

File No.
26CV036044-590

In The General Court Of Justice
☐ District ☒ Superior Court Division

*Name Of Plaintiff*
Dustin Swinehart

**VERSUS**

*Name Of Defendant*
DT Soccer, LLC, d/b/a Charlotte FC - Tepper Sports and Entertainment

# APPLICATION AND ORDER EXTENDING TIME TO FILE COMPLAINT

G.S. 1A-1, Rule 3

## APPLICATION

The undersigned requests permission to file a complaint in this action within twenty (20) days of any order granting this Application, as provided in Rule 3 of the Rules of Civil Procedure. The nature and purpose of the action are:

*Name And Purpose Of The Action*
Plaintiff brings claims against the Defendant, DT Soccer, LLC, d/b/a Charlotte FC - Tepper Sports and Entertainment, for: (1) Wrongful Discharge in Violation of North Carolina Public Policy; and (2) Violation of Title VII of the Civil Rights Act of 1964.

| *Date* | *Signature* | |
|---|---|---|
| 6/26/26 | [signature] | ☐ Applicant<br>☒ Attorney For Applicant |

## ORDER

The Court states that the nature and purpose of this action are as set forth above.

Therefore, it is ORDERED that permission is granted to the applicant to file a complaint in this action up to and including the date shown below.

| *File Complaint On Or Before* | *Date Of Order* |
|---|---|
| 7-16-2026 | 6/26/2026 2:43:00 pm |
| *(Date must be within 20 days of date of Order.)* | *Signature*<br>/s/ Mitchell Woodard |
| | ☒ *Assistant Clerk Of Superior Court* ☐ *Clerk Of Superior Court* |

**NOTE:** *Under Rule 3 of the Rules of Civil Procedure, upon entry of this Order, a summons shall be issued and the summons and a copy of this Order must be served in accordance with the provisions of Rule 4. A complaint must be filed in this action within the period provided above and that complaint must be served in accordance with the provisions of Rule 4 or by registered mail if the plaintiff so elects. If a complaint is not filed within the above period, the action shall abate.*


© 2011 Administrative Office of the Courts

**STATE OF NORTH CAROLINA**

Mecklenburg County

File No
26CV036044-590
Scan No

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name Of Plaintiff
Dustin Swinehart

**VERSUS**

Name Of Defendant(s)
DT Soccer, LLC, d/b/a Charlotte FC - Tepper Sports and Entertainment

# CIVIL SUMMONS TO BE SERVED WITH ORDER EXTENDING TIME TO FILE COMPLAINT

G.S. 1A-1, Rule 4

**To:**

Name And Address Of Defendant 1
DT Soccer, LLC,
d/b/a Charlotte FC - Tepper Sports and Entertainment
800 South Mint Street
Charlotte NC 28202

**To:**

Name And Address Of Defendant 2

**IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served with the complaint as authorized in the attached order. You may serve your answer by delivering a copy to the plaintiff or the plaintiff's attorney or by mailing a copy to one of them at his/her last known address.
2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)
Josh Van Kampen, Esq
Van Kampen Law
315 East Worthington Ave
Charlotte NC 28203

Date: 6/26/2026 Time: 2:43:00 pm ☐ AM ☐ PM

Signature: /s/ Mitchell Woodard

☐ Deputy CSC ☒ Assistant CSC ☐ Clerk Of Superior Court

(Over)


© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the Order were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|
| | | |

☐ By delivering to the defendant named above a copy of this Summons and Order.

☐ By leaving a copy of this Summons and Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein, who is named below.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Summons and Order to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and Order received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|
| | | |

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|
| | | |

☐ By delivering to the defendant named above a copy of this Summons and Order.

☐ By leaving a copy of this Summons and Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein, who is named below.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Summons and Order to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and Order received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|
| | | |

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Date Received | Signature Of Deputy Sheriff Making Return |
|---|---|---|
| $ | | |
| Paid By | Date Of Return | Name Of Deputy Sheriff Making Return (type or print) |
| | | County Of Sheriff |


© 2023 Administrative Office of the Courts